May it please the court, Laura Levitt for Mr. Castillo. The sole issue in this case is whether Trooper Collins had reasonable suspicion that Mr. Castillo violated the Texas traffic law of driving in the left lane without passing after having passed a sign warning left lane for passing only. The resolution of this issue depends on this court's choice between two competing reasonable suspicion analyses presented by the district court's written opinion below. One, whether the court can rely solely on a generalized estimate of probabilities that a driver would have passed the sign given the general traffic patterns in the area, as the district court did below and the government urges this court to do on appeal, or two, whether based on the totality of the circumstances the court looks to specific and articulable facts that gave the trooper an objective basis for suspecting that Mr. Castillo had passed that sign, as the Supreme Court and this court's precedent require. The answer is that reasonable suspicion determinations do not condone sole reliance on the general estimate of probabilities that was applied in this case. This court, the Supreme Court, requires specificity, objectivity, and individualization. In this case, the government had to present evidence that Trooper Collins had a particularized and objective basis for suspecting that Mr. Castillo passed that sign, but there is no such evidence in this case. In fact, the prosecutor even noted at the suppression hearing that the trooper just assumed that Mr. Castillo had passed the sign, but that assumption isn't valid. It's not reasonable on the facts. The only facts in the record are that the trooper observed Mr. Castillo at a location 5.3 miles from the sign. The trooper did not see Mr. Castillo pass that sign. He didn't have any other evidence that Mr. Castillo passed that sign, and between the sign and the trooper's first sighting, there were intermediary access roads, and at least one exit ramp and entrance ramp onto another road that went east-west, as even government's Exhibit No. 2 shows. The trooper also admitted that at the time he stopped, Mr. Castillo could have entered Highway 59 on any of those several access roads, but from this evidence and, quote, common sense, the district court determined that over a 50% or even likely higher chance that people driving on Highway 59 at the point where the trooper saw Mr. Castillo would have passed that sign. Were you the counsel? You weren't the counsel, were you? In the district court? Right. I'm just, I was very perplexed why the district court went off on this probability analysis. I understand that it's in Justice Scalia's dissent and the Navarrete opinion, but why would that have been the focus, and why wasn't he brought back to normal... In the district court? Yes, normal totality of the circumstances for reasonable suspension. Okay, I'm sorry. I don't believe that the district court truly revealed his hand at the... At the hearing, it wasn't obvious that that was the legal route, is it? It wasn't. He mentioned something about preponderance of the evidence over 50%, reasonable suspicion is less, but he certainly didn't indicate he was going off into this new world of reasonable suspicion analysis. And, I mean, maybe it's because he could think... You know I don't know what the district court was thinking. You don't know what's in the district court's mind, but was reconsideration sought to say, please do the correct test? No, it wasn't. And, you know, I think, I don't remember when the opinion was dated. I don't know how long after the hearing. It was signed on June 30th, 2014. The suppression hearing was on February 6th of 2014, so I'm not so sure. It could have been done timely. Anyway, I'm not sure of that, but no, it wasn't reconsidered. Could you confirm, though, nonetheless, by saying that Officer Collins could have reasonably believed based on his The trooper didn't testify to his personal knowledge. He was in the area for a year, but he didn't testify about the general traffic patterns in that area on 59 in particular, on the access roads. He didn't testify to the type of vehicles that would come on and off that road, his familiarity with those kinds of vehicles. He didn't testify why he positioned himself at the point he did, 5.3 miles past, rather than at a point just past one of those access roads where he could see whether somebody was violating that traffic violation. I know other people, this isn't relevant necessarily to the decision in this case, but other people on the tape are traveling in the left-hand lane, and even on the tape, the video, government exhibit number two, you see them. Perhaps the trooper wasn't in a marked patrol car that day, but people were clearly driving in the left lane, some moving back over to the right, but a lot just pursuing on this merry way. But there were also cars coming off the access roads on that videotape as well to show that they're not roads to nowhere, as the court in Garcia, the northern district of Texas case in Garcia said. One was a main highway intersection, wasn't it? Like about a mile before, there's a main highway intersection. State Route 185, I think. Right, and a town right off of that. And from the map, it goes right into Victoria, and it converges, and you could see there, cars going east and west. If there had been no entrances from the feeder road, would you still win? It would be a harder question. And I'm not saying you win. Well, I hope we do. But anyway, it would be a much harder question. I mean, there are possibilities that if it's a driveway, a dirt road from a ranch, it would all depend on the specific area. But no, if there were no particular access onto the street, and the sign were a reasonable distance from the stop, I think that would be the question then, what would be a reasonable distance? The Texas Court of Criminal Appeals in Abney said that 15 to 20-some-odd miles from the point of the stop is not reasonable notice. We don't know yet what would be the least amount of distance that would constitute reasonable notice of the sign. I just want to point the court to Garcia, of which the district court mentioned, that that is a good case for us. The only reason the court truly discounted that case was because it didn't apply an estimate of reasonable probabilities. Well, Garcia, there was a justification for being in the left lane. He said he was passing a truck. So Garcia really doesn't help you. Well, Garcia does because that was after the stop. What came before that stop, it wasn't clear that the defendant was going to be turning. The court went off on, at least in its opinion, went off on the fact that there were these intermediary roads and that none of the intermediary roads were temporarily closed at the time. The district court below thought that maybe that wasn't really what the court was looking at. It was looking at the evidence that there were farms and gas stations and- Three on ramps. Other businesses there. But the opinion doesn't really reflect that. He went off on those roads, and so much so to say these aren't roads to nowhere. Whoever designed and constructed those roads had a reason for doing so, probably based on the general traffic population. So I do think Garcia's a good case, but if not, Rainey, although not directly on this traffic violation, I did a Rule 28J letter on that, is indicative of what kind of evidence, is indicative of the result that should be in this case, because that case involved at least one traffic violation that had a contingent factor that needed evidence to support the traffic stop. And there it was failure to obey traffic directions by a police officer. And the government failed to present evidence that was required under Texas law to show that he suspected Rainey of being aware of the police officer, that there was no evidence that Rainey was aware that the police officer was present. Here the contingent factor is, in order to be a traffic violation, you have to have passed that sign and be driving in the left lane without passing. The government here didn't point to anything, didn't point to any of the roads were closed, didn't point to the fact that the vehicle was not a typical vehicle for the area, too clean to have come off one of those roads. Not the kind of road- What about the fact that when he pulled up alongside and drove alongside the road, there was a deliberate, by the passenger, refusal to look at the policeman? I mean- That could be indicative of- Or the driver. I mean, when someone pulls on the side of you, you usually look. Would that not give probable cause to the policeman to suspect something was wrong? He could have a, he could suspect, but it wouldn't be reasonable suspicion to stop. It's not particularized of anything. I tend to be paranoid when a police officer pulls up next to me. Sometimes I look, sometimes I don't. Well, if you're in the left lane, you're not supposed to be in the left lane. But if you're in the left- You would move over to the right lane if you were- But if I didn't see the sign and I'm driving in the left lane and everybody else around me is driving in the left lane, I'd probably continue to drive in the left lane. Well, everybody was driving in the left lane. Well, people were driving in the left lane. He had to weave in through, but I'm not using that as an excuse. That's not the evidence. That's not a finding in this court, and that's not the reason to stop. Anyway, it's just sort of color commentary that even when the police officer was there, in this case, people were not moving over from the left lane to the right lane. But the real point is that that factor alone doesn't mean he's passed the sign. It just, it might mean he didn't pass the sign because he would have moved over. Probably you would start driving more carefully and go, gosh, I passed that sign, I forgot to move over. But he didn't, so it's more indicative that he either didn't know the sign or he hadn't passed the sign, either of which doesn't allow the officer just to assume that he passed the sign. There's no other basis in the record for stopping him in this case. No evidence was developed of alternative traffic violations. In the human trafficking reference, even the trooper himself said that no, not at that time. It wasn't until after he stopped the car and saw the people laying in the back of the Ford Explorer did he develop his, well, he knew at that point that something was really wrong and he did have- People don't normally lay on the floorboard of the car. Exactly, and at that point he put two and two together. But he did admit at the suppression hearing that he did not suspect human trafficking at that point. It wasn't until the stop, at the time of the stop, that the trafficking became- More apparent to him, but it wasn't enough for the stop. He truly based the stop on the left lane driving without passing. He also mentioned, at least in his report, because the district court asked him about it, what was the basis for your stop, and he said left lane without passing. But he also said failure to maintain a single lane. But the trooper never testified about that. The court didn't find that. And the tape itself, at least at the point that's recorded, doesn't show him, at least in my estimation, that he failed to maintain a single lane of traffic from which this court could- Didn't he also testify that there were no major intersections between the sign and where he stopped this car? No major intersections between the sign and where the stop was? He testified on cross-examination. We brought it up that there were intermediary roads. I can't remember, Your Honor, about no major intersections. But when you look at Government's Exhibit No. 2, there is an exit ramp with a big green sign, State Route 185, going up to and off of road on which there's traffic going this way. And you can take judicial notice of the map. It goes into Victoria and all the way to the coast. So it's a major road. If he had testified to that, that there were no major intersections, the fact that the videotape clearly shows that there were major intersections, that the big highway intersection on the way to Victoria, wouldn't that under the Scott case or the Supreme Court case that says you're allowed to look at the videotape and that trumps everything, wouldn't that apply? Yes, it would. I mean, the government introduced this evidence for the purpose of showing the distance, but in effect it was showing the area. I'm still perplexed about the opinion. The opinion says the situation seems similar with essentially the same distance and only one more entryway than in Garcia. And then the very next sentence says, the Garcia court, however, did not appear to engage in the probabilistic estimation that the case law, including Avizu and Navarette, seemed to require. So the district court seemed to say that although the situation was the same as Garcia, although he wasn't completely clear on the facts of Garcia, he says in the previous sentence, that the fact that they didn't do the probabilistic explanation is the whole reason he's setting that to one side because he seems to be of the impression that he's required to do a probabilistic estimation by these two cases. That is my take on the case as well. I believe that but for the lack of a probabilistic estimation in Garcia, this district court would have denied, would have granted the suppression hearing, and there would be no conviction. Counsel, as an officer of this court, are you aware of any Supreme Court case or case in the Fifth Circuit that requires a probabilistic estimation? To date, no. I know that there are law review articles that discuss the pros and cons of probabilistic evidence, but they even say that to date, as far as the standard applies, probabilistic determinations are not welcome in Fourth Amendment analysis. All right, thank you. You saved some time for rebuttal. Mr. Gould. Good morning, and may it please the Court. Andrew Gould for the United States. I'd like to begin by setting forth some of the general principles of reasonable suspicion. First, in Ornelas v. United States, the Supreme Court explained that the principal components of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or probable cause. Wren v. United States makes it clear that reasonable suspicion need not rule out the possibility of innocent conduct. And finally, as most recently reaffirmed in Navarrete v. California, district court must apply a common-sense approach in determining reasonable suspicion, looking to the totality of the circumstances. Turning to the facts of this case, here are the historical facts. Are you aware of any case law as an officer of this court that the courts are required to engage in a probabilistic estimation in order to determine if reasonable suspicion applies? Are you aware of any case law that says that? Excuse me. The government is not aware of any cases, but to be candid with the court, just like defense counsel, it's not exactly clear to the government what the district court meant by probabilistic estimation, and that's been the subject of some debate that's really come out, I think, in the reply brief. And if I can explain what the government believes the district court was doing. First, the district court stated at R.O.A. 65 and 66, this is where it's setting forth the unquestioned principles of reasonable suspicion before Justice Scalia's suggestion, which I'll get into. And as part of this, the district court stated, quoting Navarrete, which quoted from previous cases, reasonable suspicion requires considerably less than proof of wrongdoing by a preponderance of the evidence. It then quoted Justice Scalia's suggestion in dissent in Navarrete that perhaps 1 in 20, or excuse me, 1 in 10 or even 1 in 20 would suffice. But the district court didn't believe that Justice Scalia's dissenting opinion controlled its analysis. In fact, at footnote 7 of the district court's opinion, R.O.A. 69, the district court states explicitly neither Arvizu nor Navarrete announced any new principles. Rather, they reiterate the principles on which this court relies. And context matters. Look at the context in which the district court explained Justice Scalia's suggestion. It had first stated that, quote, reasonable suspicion requires a, quote, relatively low threshold. It then goes on to state that reasonable suspicion requires considerably less than preponderance of the evidence and obviously less than probable cause, and then Justice Scalia's suggestion. But the point was simply that you have four dissenting justices led by Justice Scalia and the Navarrete who would have declined to have found reasonable suspicion, yet even they recognized how low the threshold was. In their opinion, it simply wasn't met in Navarrete. The district court's point in quoting Justice Scalia was simply that the Supreme Court unanimously agrees as to how low this standard is. And as to the quantifying the probabilities, which has become apparent again in the reply brief, Mr. Castile correctly cites Maryland v. Pringle in his reply brief that with the related probable cause standard is incapable of precise quantification. Florida v. Harris more recently quotes that. And the government agrees that this, because of how similar reasonable suspicion and probable cause are interpreted, that would likely be the case for reasonable suspicion. But the district court understood that it couldn't quantify the probabilities, and we see this from the suppression hearing, ROA 163. There the district court, in explaining reasonable suspicion, stated it's less than 50% certainty. It's hard to quantify other than that. Well, that's correct because preponderance of the, again, if it's been well recognized ever since United States v. Socolow 1989 by the Supreme Court that reasonable suspicion requires considerably less than preponderance of the evidence, then it logically follows that where an officer has suspicion of wrongdoing supported by a more likely than not probability, then that officer equally has reasonable suspicion. And so there was no error in what the court was doing if, by contrast, let's say that Judge Costa had said, well, Justice Scalia suggests that 1 in 10 or 1 in 20 is good enough. And here I think there is a 15% probability. The government would have a much tougher case. We may not even defend it. I'm not going to affirmatively state that, but it would be a much more difficult case. Instead, what the district court did was it keyed it to the preponderance of the evidence standard. District courts make preponderance findings on a daily basis, not, of course, necessarily in the reasonable suspicion context, but they're well equipped to make that. How do you establish reasonable suspicion in this case without probabilities given that the officers did not observe and didn't say that he believed that the person hadn't gotten on and, in fact, said he couldn't, he would just be guessing or having a hunch? Sure. What is the reasonable suspicion in this case? Absolutely. Well, again, I'd like to go back to Wren v. United States, which states that reasonable suspicion need not rule out the possibility of innocent conduct. And in PAC, which the government has, I believe, cited, I'm not sure if it was in this case or in Montes Lopez. No, excuse me, we did cite this in our response brief. I'm not asking for the case law that says what the standard for reasonable suspicion is. I'm asking you for what the evidence was that the officer had a reasonable suspicion. Sure. We have the dashboard camera videos. We have two of them here. The first one shows the stop, excuse me, it's after Trooper Collins pulls out and follows Mr. Castillo and then subsequently stops him. And then we have two days later where Trooper Collins goes back at 7.30 in the morning and films the entire 5.3-mile stretch of highway followed by the six-mile stretch. And we've had an opportunity to look at those videos. So what is it about what shows the officer had reasonable suspicion? Sure. Focusing on Exhibit 2, because, again, that is what shows the 5.3-mile stretch, and, again, that occurred at 7.30 in the morning, you do see traffic in both directions. But what really matters is are cars using the intersecting entryways? And from my view of the video, in that 5.3-mile stretch, not afterward, but the 5.3-mile stretch, I counted one. I saw one truck enter from a highway entrance ramp. There were, again, looking at a map, which counsel correctly stated this court can take judicial notice of, there are two highway entrance ramps, there are three minor intersecting roads, and two turnabouts. Again, I counted one truck entering on one of the highway entrance ramps. I did not see any other vehicles use either of the entrance ramps. I did not see any vehicles using the minor intersecting roads or the turnabouts. Again, focusing on the fact that the trooper calls did not need to know to a certainty that Mr. Castillo had passed a sign, what that video shows, again, and this is at 7.30 in the morning on a Wednesday as opposed to when the stop occurred, which is at 12.30 at night on Sunday evening, Monday morning. And if you only see one vehicle entering at 7.30 in the morning, Trooper Collins reasonably could equally infer that there was a significant probability that he had been driving past a sign. But did he testify to that? No, Your Honor. He did not testify to that is the problem with this case. It's true, Your Honor, that he did not specifically testify to it. But in Ornelas, the Supreme Court explained that sometimes the background facts aren't the subject of explicit factual. It's not the background fact. It's the crucial thing. Did he have reasonable suspicion? He could say, I reasonably suspected he passed a sign because of my knowledge of that roadway and the amount of traffic on it. And if he said that, I think the other side would have a really hard time. Right. And we agree that it does become a more difficult case based on the testimony here. But this court can affirm for any reason supported by the record. And as this court I think most recently stated in Scroggins, if there's any reasonable view of the evidence, then this court is obliged to affirm the district court's opinion. And that's the government's position in this case. If you look to the totality of the circumstances here we have. At the time of the stop. But what you're telling us is something that he saw two days later at a different time. Are you trying to develop reasonable suspicion after the stop has taken place? I mean, you look at it, what was in the mind of the officer at the time that the stop took place? I agree, Judge Prado. But what the government is simply saying is that Exhibit 2 supports what Trooper Collins could have reasonably inferred at the time of the stop. It just goes to show that, again, based on the fact that there was not much traffic entering the highways at 7.30 in the morning, Trooper Collins easily could infer at 12.30 at night that there would be less traffic. Common sense is part of the calculation. And it's also the common sense of the district judge. Ornelas makes that clear. Ornelas states that reviewing courts are to give due deference to inferences drawn from facts by resident judges and local officers. Can we get back to what did the officer reasonably think at the time? Is the only evidence of what the officer really, the only direct evidence in his testimony that he did not know whether he had passed a sign? What is the specific evidence on what the officer thought at that time? Of what the officer thought at the time with respect to whether he passed the sign? Again, Judge Elrod, there's not specific testimony. But at one point in the hearing, Trooper Collins understood that he had to pass a sign. This is at ROA 153. He agreed that, quote, there has to be a sign. And then counsel then asked, if there's no sign informing the driver of what they have to do, then there's no violation. And he agreed. So Trooper Collins implicitly understood that he had to pass a sign. Which is why he stopped him. Which is why. Because he, based on his experience with the area, based on the traffic patterns, he knows as being a trooper in that area. He sees a car in the left lane. The reason he stops him is because he presumes he passed the sign. Yes, Judge Clement. Based on the geographic area and the traffic patterns. Absolutely. Illinois v. Wardlow states that officers are not required to ignore the relevant characteristics of a location. But is there any evidence in the record that that was what he did, that he knew the area? He could have easily testified, I knew the area and I thought he passed a sign. Yes, Judge Elrod. That's not in the record. We agree that, again, we agree that there was no specific testimony to this. But, again, because this court can affirm for any reason supported by the record, we think that the record amply supports that he had an objectively reasonable officer in his position at 1230 at night on the outskirts of Victoria County in a not heavily trafficked, excuse me, a stretch of highway that does not pass through heavily populated areas and that the intersecting entryways, though there are some, are not heavily traveled. It bears mentioning here, by the way, that these were factual findings made by the district court at ROA 67. Now, my friend hasn't brought these up until its reply brief. So there's a question about whether or not these are actually – that any challenge to the factual findings are forfeited. What is an actual factual finding? The probability estimates are not a factual finding. I'm not – here, Judge Elrod, I'm not referring to the 50 percent certainty, although I'll get to that in a second. Here, what I'm referring to is where the district court wrote specifically, and this is, again, on ROA 67, that the 5.3-mile stretch, quote, does not pass through heavily populated areas, quote, few heavily traveled routes that enter U.S. 59, and that intersecting minor roads are not a heavy source of traffic. Those are factual findings. And also, with respect to the 50 percent finding, we agree that in terms of methodology, that's a question of law. How the district judge applied reasonable suspicion is a question of law for this court to apply. But it's not a question of law where a district court finds that it's more likely than not that somebody driving along this stretch under these circumstances would have passed a sign. Now, that is applied to the methodology, but that's an underlying factual finding. Again, this was not challenged until the reply brief. So the government submits – and the government, again, submits the totality of the circumstances, the record, Trooper Collins' own experience, the common sense that he could bring to this, as well as the experience of Judge Costa, a resident district judge at the time. I believe he was elevated to this court a month after – or excuse me, a month before he issued the opinion. But he was assigned to the Victoria and the Galveston divisions. Counsel, we haven't yet talked about the Garcia case, and aren't we bound? The district judge said that the Garcia case had very similar facts. Why aren't we bound by the holding in the Garcia case? Because Garcia is a district court opinion. The case that the judge Costa was discussing was a case out of the – I'm sorry. I'm talking about the case with Judge King. I'll find it in a second. Is this – I know that there's a Garcia case from 1999, a Fifth Circuit. And that one, if that – but if I actually – if I'm remembering correctly, that was a Judge Jolly opinion. Actually, that – I know this – I don't think it's a case you're discussing, but it's important because here in this United States v. Garcia, it's a 1999 published opinion. There, this court stated, again, with the related probable cause standard, it need not reach 50 percent certainty. This court has thought about it in terms of percentages, of course, as key to preponderance of the evidence. Judge Alvarado, unfortunately, I'm unfamiliar. No, I'm sorry. Thank you for – you answered the question well. The Garcia that you're – we're talking about is a district court opinion. Yeah, from Judge Lindsey, I believe, in the Northern District. So this court isn't bound by it. But again, we think it's – even if it were from this court, we think it's readily distinguishable. Judge Clement, I think you brought – How is it readily distinguishable? Sure. So in Garcia, what occurred was the officer saw the – he saw Mr. Garcia driving by in the left lane. But at the time he was passing – at the time that he effectuated the stop, he was passing a big rig truck and, I believe, one or two other vehicles. So there's actually no reason – there was no impermissible driving in the left lane. Also, when the officer decided to effectuate the stop, he sped up in the right lane. And so Mr. Garcia couldn't safely – couldn't safely merge into the right lane. So there actually was no violation. Here there is no – there's no argument that Mr. Castillo was impermissibly driving in the left lane. It's about the sign. But this is not – the basis for the decision was based upon the entrance ramps. Absolutely. It's not based upon some left turn or the rig. None of that is the basis for Judge Lindsey's decision. I agree, but I – but as the government explained in its response brief, we also think that there are some problems with Judge Lindsey's reasoning with respect. What is that? I'm sorry? What are those problems? The problems is that Judge Lindsey didn't consider that reasonable suspicion need not rule out the possibility of innocent conduct. It's okay. The court – or, excuse me, the officer does not have to observe the person passing a sign. If that were the case, we would be far beyond reasonable suspicion. We would almost be at proof beyond a reasonable doubt at that point because if the officer sees him pass a sign and he sees him impermissibly driving, you've proved it right there. We're at a much lesser standard, one of the lowest standards, reasonable suspicion. And with respect, Judge Lindsey didn't consider that. He really – yes, it's true. There are intersecting highway entrance ramps, although there, we don't – there's no record, at least from the opinion, about whether these entryways were heavily trafficked or not heavily trafficked, as Judge Costa here at ROA 67 discussed, with respect to these intersecting routes. We think it's factually. We also think it's legally distinguishable. But again, we understand the court's point that he distinguished it on the basis of the probabilistic estimation. We would submit it's distinguishable for other reasons well beyond that. And finally, I'd just like to state that what it seems in requiring directly observable illegality, Mr. Castillo is asking this court to reimpose the particularized suspicion requirement, which it has rejected. And it's rejected that in pact. Isn't that a straw man? They're not requiring to say the officer actually observed. With respect, Judge Alrono, I don't think it's a straw man because what they're essentially saying is that if there are any intersecting entryways, then there can never be reasonable suspicion. I don't believe they've ever made that argument. I thought the argument is that the officer has to come forward and say, based upon my knowledge and experience, I reasonably expected this, and that's the flaw in this case. I see that my time is up. I can answer the court. We think that that's essentially what follows from Mr. Castillo's argument. You're right that Mr. Castillo has never claimed that if there are intersecting entryways, there can never be reasonable suspicion. The government's position is respectfully that's essentially what he's saying. Thank you. I'd like to say that Garcia is a northern district of Texas case. It is persuasive. But before I get to that, no matter if the standard of review is beyond a reasonable doubt, preponderance of the evidence, probable cause, reasonable suspicion, just general estimate of percentage of behavior based on general population is overbroad. The Fourth Amendment looks at probabilities in the totality of the circumstances based on a law enforcement officer, trained law enforcement officers, objective observations. And from that, determines whether those particular facts, inferences, deductions, raise a particular suspicion about a particular person doing wrongdoing. Here, it's very easy to assume that Mr. Castillo passed the sign and just violated the law. But an assumption is not enough. It's simply guesswork. Much as the district court's estimate of probabilities is guesswork. Well, it's not guesswork. If he's familiar with the on-ramps and the off-ramps in the little city, it's more probable than not that this guy stayed on the main thoroughfare, passed the sign, and then was intersected by the policeman. He's basing that on what he knows, what the facts of the area are, based on his experience, based on being a trooper in the first place, based on knowing why people are in the left lane or the right lane. But that's all very generalized knowledge. Even if he did know— Well, he can't be there and see every traffic offense. What are you asking for? The court can't be the witness in the case. The court can't develop the facts for the case. Common sense means interpretation of the evidence presented. The court can find the facts. If the facts are presented to them. Right. But there's no sound methodology underscoring the district court's determination of an over 50% likelihood. There's no statistical data. There's no representative time frame in which he observes the traffic. We don't know how long the court was there in the Victoria area living, if indeed he did, or visiting, if indeed—how often he did. We don't even know how long—we don't even know the trooper trafficked. My point is we need a representative sample from a representative period of time for the particular location, geared towards the location and the type of crime. Did the trooper testify about any of that? None of that. And even though these exhibits, exhibit number two and exhibit number one, show after-the-fact information, we can't base this case on after-the-fact information, say that that's what the officer saw at the time of the stop. We only know that's what was after the stop, but it's still not particularized. And we're not asking the court to rule out all possibility of innocent conduct. We're asking the court to uphold the Fourth Amendment's specificity requirement. I mean, the Supreme Court's made clear, even if the chances are great of finding evidence of criminal wrongdoing in a tavern, on a bartender, for which a search warrant was issued on probable cause, if the nine or 13 other patrons in the bar, in Ibarra versus Illinois, were not a subject of that search warrant, unless you can point to that person and say, I suspect he's armed and dangerous, or I suspect he has drugs because of furtive movements, because of erratic behavior, because of hiding something in his pocket, then you have an articulable, objective basis. The officer had said, I traveled this route, and I know that no one ever enters from these other entrances, and therefore, and one of the entrances is blocked off by construction, and so you couldn't enter it. Would you be standing here today? First, yes. The second, perhaps no, depending on the rest of the circumstance. And I'd have to say Fourth Amendment analysis is fact by fact. The temperate, the closed entrance and exit ramps, difficult. The other one, general, still not pointing to why Mr. Castillo would not have come off. He might have been living in the area for months, just as any – Well, surely he would have said that. After the fact. He would offer an explanation that didn't happen. He could have, but that would have been after the fact. Like, oh, I'm making a U-turn. That's after the fact. The Fourth Amendment doesn't deal with after the fact situations. But if that was the explanation, the whole thing would have been questionable. But it doesn't matter. No. The Fourth Amendment doesn't allow you to go past the moment of the stop. It just doesn't. Well, they found no probable cause in the Garcia case and the Abnett case based on the defense counsel's argument. I'm sorry. I didn't understand your question. You're talking about after the defense counsel argued that he was in the left lane because he was making a U-turn. It was color commentary. Right. It wasn't the reason that the stop was found unreasonable. It was based on the distance of the – I see my time's up. It was based on the distance. The sign was away, not on the after the fact. That was just – I know your time's up. I'm just curious. Was your client issued a traffic violation ticket? No, he was not. No. He was charged with – We're wrestling for trafficking. Anyway, thank you. Sorry I took over. All right. Thank you.